# EXHIBIT A TO

# NOTICE OF RECENTLY DECIDED AUTHORITY RELEVANT TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED COMPLAINT

Westlaw.

2010 WL 354937
--- F.Supp.2d ----, 2010 WL 354937 (S.D.N.Y.)
(Cite as: 2010 WL 354937 (S.D.N.Y.))

Page 1

**H**Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
In re LEHMAN BROTHERS SECURITIES AND ERISA LITIGATION
This document applies to: In re Lehman Brothers ERISA Litigation, 08 Civ. 5598(LAK).
No. 09 MD 2017(LAK).

Feb. 2, 2010.

Mark C. Rifkin, Scott J. Farrell, Rachel S. Poplock, Wolf Haldenstein Adler Freeman & Herz LLP, Thomas J. McKenna, Gainey & McKenna, for Plaintiffs.

Michael Joseph Chepiga, Jonathan K. Youngwood, Simpson Thacher & Bartlett LLP, for all Defendants except Richard S. Fuld.

Patricia M. Hynes, Todd Steven Fishman, Allen & Overy, LLP, for Defendant, Richard S. Fuld.

**MEMORANDUM OPINION**

LEWIS A. KAPLAN, District Judge.

*1 One of the pivotal events of the financial crisis that burst in late 2008 was the spectacular failure of Lehman Brothers Holdings, Inc. ("Lehman"), a major investment banking house. This collapse, like other major financial disasters, has spawned a flurry of class actions and other lawsuits including this one.

This case concerns the Lehman Brothers Savings Plan (the "Plan"), which held Lehman stock and suffered a large loss when the firm failed. Plaintiffs are plan beneficiaries. They sue Lehman's former directors (the "Director Defendants") and a member of Lehman's Employee Benefit Plans Committee (the "Plan Committee"), principally albeit not exclusively on a theory that the defendants knew of Lehman's deteriorating condition but imprudently failed to protect the Plan under the Employee Retirement Income Security Act ("ERISA"). Defendants move to dismiss the complaint on the ground that it fails to state a claim upon which relief may be granted.

*Facts*

*The Defendants*

The defendants in this action are eleven members of the Lehman board of directors, four of whom served on the board's Compensation Committee, [FN1] and Wendy Uvino, the chair of the Plan Committee and the only member named.

> FN1. John F. Akers, Johnson Evans, Christopher Gent, and John D. Macomber.

*The Plan*

Lehman sponsored the Plan as a retirement savings device for its employees. The Plan was subject to ERISA and permitted eligible employees to contribute a percentage of their pay to the Plan and to allocate their contributions among different types of accounts. [FN2] One option was the Lehman Stock Fund, which invested solely in Lehman's common stock, cash, and short-term fixed income investments. [FN3]

> FN2. *Id.* ¶¶ 63, 65.

> FN3. *Id.* ¶¶ 64, 70.

The Plan designated the Plan Committee as its "Named Fiduciary" and "Plan Administrator." [FN4] According to the consolidated amended complaint ("CAC"), the Director Defendants were responsible for appointing the Plan Committee. [FN5] They delegated this power to the board's Compensation Committee. [FN6]

> FN4. *Id.* ¶¶ 45, 90.

> FN5. *Id.* ¶ 82.

> FN6. *Id.* ¶¶ 40, 44, 86-89.

The Plan Committee had the power to administer the Plan, including the "full discretion and authority to

make all decisions in connection with the administration of the Plan." [FN7] During the class period, Ms. Uvino allegedly served as the chair of the Plan Committee and, in that role, "managed all aspects of the benefits programs and oversaw the Human Resources data management functions." [FN8] She also signed the Plan's 2006 and 2007 Forms 11-K and 2006 Form 5500. [FN9]

> FN7.*Id.* ¶¶ 47-52.
>
> FN8.*Id.* ¶ 56.
>
> FN9.*Id.*

According to the CAC, each Director Defendant exercised discretionary authority by "determining or participating in decisions about the substantive content of Lehman's SEC filings." [FN10] These filings were incorporated by reference into the statutorily-required summary plan description ("SPD"). The CAC alleges also that the Director Defendants "were fiduciaries of the Plan within the meaning of ERISA ... in that they exercised discretionary authority with regard to the management and administration of the Plan and the management or disposition of the Plan's assets." [FN11]

> FN10.*Id.* ¶ 84.
>
> FN11.*Id.* ¶ 37.

*The Complaint*

**\*2** Over the last decade, Lehman was a major participant in the mortgage origination market and in underwriting subprime mortgage backed securities. [FN12] During that time, Lehman accumulated and held on its books large amounts of subprime loans, subprime mortgage backed securities, collateralized debt obligations and other real estate related assets. [FN13] The CAC alleges that Lehman overvalued these assets and that its financial condition therefore was weaker than disclosed. The complaint's principal claim is that it became imprudent, at some time during the class period, for the Plan to hold Lehman common stock and that defendants breached their fiduciary duties by failing to take appropriate action. Plaintiffs claim also that the defendants failed to disclose material information about Lehman to Plan participants, subordinated the Plan's interests to their own, and failed to monitor appointed fiduciaries.

> FN12.*Id.* ¶ 127.
>
> FN13.*Id.* ¶ 4.

It is unnecessary to recount the details of the CAC except with respect to its allegations that, at some point, the Plan's fiduciaries became aware of Lehman's imminent collapse. Anyone with access to a newspaper or television knows that Lehman had problems during second and third quarters of 2008. [FN14] September, however, was its most eventful month.

> FN14.*See, e.g., id.* ¶¶ 223-24, 233-39, 242-45, 250.

On September 4, 2008, J.P. Morgan, Lehman's clearing bank, demanded $5 billion in collateral from Lehman. [FN15] The next day, *The New York Times* published an article describing the possibility that Lehman would place its troubled assets into a new corporate entity, a "bad bank," thereby providing relief to Lehman's balance sheet. [FN16] On Tuesday, September 9, 2008 "top Lehman executives discussed the need to raise between $3 and $5 billion to 'shore up capital by early 2009.' " [FN17] That day, Lehman's stock fell forty five percent. [FN18]

> FN15.*Id.* ¶ 253.
>
> FN16.*Id.* ¶ 254.
>
> FN17.*Id.* ¶¶ 255.
>
> FN18.*Id.* ¶ 260.

On Wednesday, September 10, 2008, Lehman announced a $3.9 billion loss for the third quarter of 2008 as well as plans to raise capital and reduce its exposure to "commercial and residential mortgage and real estate assets." [FN19] The press release noted the "bad bank" plan as well. On a conference call that day, Mr. Fuld told investors that the "firm was 'on the right track to put these last two quarters behind us' " and that Lehman's "capital position at the moment is strong." [FN20]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN19.*Id.* ¶¶ 256-57.

FN20.*Id.* ¶¶ 258-59.

On Thursday, September 11, J.P. Morgan again demanded $5 billion in collateral from Lehman. [FN21] The next day, Friday, September 12, 2008, credit rating agencies warned that they would downgrade Lehman's debt if it were unable to raise additional capital. [FN22] The CAC alleges that "customers were leaving Lehman in droves" and overwhelmed the company's cash management systems. [FN23] Over the weekend, Lehman worked to arrange a sale to potential buyers and began preparing a bankruptcy filing. [FN24] It completed its bankruptcy papers on Sunday, September 14, and filed in the early hours of September 15. [FN25]

FN21.*Id.* ¶ 258.

FN22.*Id.* ¶ 263.

FN23.*Id.* ¶ 264.

FN24.*Id.* ¶ 266.

FN25.*Id.* ¶ 268.

*Discussion*

A. Legal Standard

*3 In deciding a motion to dismiss, a court ordinarily accepts as true all well pleaded factual allegations and draws all reasonable inferences in the plaintiff's favor. [FN26] In order to survive such a motion, however, "the plaintiff must provide the grounds upon which [their] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.' " [FN27] Although such motions are addressed to the face of the pleadings, the court may consider also documents attached to or incorporated by reference in the complaint as well as legally required public disclosure documents and documents possessed by or known to the plaintiff upon which it relied in bringing the suit. [FN28]

FN26.*See Levy v. Southbrook Int'l Invs., Ltd.,* 263 F.3d 10, 14 (2d Cir.2001).

FN27.*ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)); *see also Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (declining to limit *Twombly* to antitrust cases).

FN28.*ATSI Commc'ns, Inc.,* 493 F.3d at 98; *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000) (citing *Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989); *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991)).

B. Plaintiffs' Claims

1. Plan Fiduciaries

ERISA's central purpose is to "protect beneficiaries of employee benefit plans." [FN29] To accomplish this, it imposes a uniform federal fiduciary duty on plan administrators and managers. [FN30] The Act, however, does not impose these fiduciary obligations on everyone. Fiduciaries are those (1) so named in the plan, or (2) who exercise fiduciary functions. [FN31] The latter category is defined "in *functional* terms of control and authority over the plan." [FN32] The initial focus therefore, is on whether the CAC adequately alleges that the defendants are fiduciaries. [FN33]

FN29.*Slupinski v. First Unum Life Ins. Co.,* 554 F.3d 38, 47 (2d Cir.2009) (citing 29 U.S.C. § 1000(b)).

FN30.*Varity Corp. v. Howe,* 516 U.S. 489, 496 (1996) (ERISA "set [s] forth certain general fiduciary duties."); *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.,* 302 F.3d 18, 26 (2d Cir.2002); 29 U.S.C. § 1104(a)(1) (describing ERISA duties of loyalty, prudence, and diversified investment).

FN31.*See In re Polaroid,* 362 F.Supp.2d at 472 ("An individual may be a fiduciary for ERISA purposes either because the plan documents explicitly describe fiduciary responsibilities or because that person functions as a fiduciary.").

FN32. *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 262 (1993); *see* 29 U.S.C. § 1002(21)(A) ("[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.").

FN33. *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000) ("[T]he threshold question is ... whether the [defendant] was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint."); *see also Harris Trust & Sav. Bank,* 302 F.3d at 28 (quoting *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1259 (2d Cir.1987)); *In re Polaroid,* 362 F.Supp.2d 461, 471 (S.D.N.Y.2005) (finding that defendant breaches fiduciary duty only "to the extent that the conduct occurs while the individual is a fiduciary and falls within the scope of his fiduciary authority").

The Plan Committee is the " 'Named Fiduciary' for operation and administration of the Plan." It is also the "Plan Administrator," [FN34] with "complete authority and discretion to control and manage the operation and administration of the Plan." [FN35] Ms. Uvino is the only defendant alleged to have been a member of the Plan Committee. [FN36] It is undisputed that she is a Plan fiduciary.

FN34. Plan § 10.9, Youngwood Decl. Ex. 2.

FN35. *Id.* § 10.1.

FN36. CAC ¶ 56.

Plaintiffs' theory as to the Director Defendants, none of whom is named a fiduciary by the Plan, is that they are fiduciaries because they had control and authority over it. This contention runs into two obstacles.

As an initial matter, the only factual allegations that Director Defendants exercised control and authority over the Plan is the contention that the board appointed its Compensation Committee and that that committee in turn appointed the Plan Committee. [FN37] I so assume. But that does not help plaintiffs. Persons who are fiduciaries by virtue of the exercise of control and authority over a plan are subject to fiduciary duties only "to the extent" they have or have exercised such power. [FN38] Thus, while this allegation would suffice if the complaint alleged that the Director Defendants breached fiduciary duties with respect to the appointment of the Compensation Committee or that the Compensation Committee breached its duties in appointing the Plan Committee, there is no such contention. The allegations concerning the Director Defendants therefore are insufficient to support the notion that the Director Defendants owed any fiduciary duty with respect to any of the matters complained of in the CAC.

FN37. CAC ¶¶ 40, 44, 82, 86-89.

FN38. *Beddall v. State St. Bank & Trust Co.,* 137 F.3d 12, 18 (2d Cir.1998) ("[F]iduciary status is not an all or nothing proposition.... [F]iduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad general terms."); *F.H. Krear & Co.,* 810 F.2d at 1259 ("Under this definition, a person may be an ERISA fiduciary with respect to certain matters but not others, for he has that status only "to the extent" that he has or exercises the described authority or responsibility.").

*4 The CAC alleges also, in the words of the statute, that the Director Defendants are Plan fiduciaries. [FN39] But this contention is a legal conclusion, unsupported by factual allegations. In the absence of any facts to support this assertion, and I need not accept it as true. [FN40] The CAC therefore fails to allege that the Director Defendants had a fiduciary duty in any respect material to this complaint.

FN39. *See, e.g., id.* ¶¶ 25-35 ("Defendant ... was a fiduciary of the Plan, within the meaning of ERISA ... in that he exercised discretionary authority with respect to the management and administration of the Plan and

management or disposition of the Plan's assets.")

FN40.*See Iqbal,* 129 S.Ct. at 1950 ("[P]leadings that, because they are no more than conclusions, are not entitled to the assumption of truth.").

Finally, plaintiffs contend that the Director Defendants are functional fiduciaries because they made or approved inaccurate statements in Lehman's SEC filings, which were incorporated into the Plan documents. The flaw in this argument, however, is that there is no basis for the assumption that the Director Defendants acted in an ERISA fiduciary capacity when making these statements. [FN41] Their limited Plan responsibilities did not include communicating with participants. Moreover, "emerging caselaw makes clear that those who prepare SEC filings do not become ERISA fiduciaries through those acts." [FN42] Plaintiffs' argument that the SPD, which incorporated Lehman's SEC filings by reference, constituted an ERISA communication by the Director Defendants fares no better. The CAC fails to allege adequately that the Director Defendants issued the SPD. The Plan Committee, not the board of directors, had the statutory obligation to do so. [FN43]

FN41.*Pegram,* 530 U.S. at 226;*In re Citigroup ERISA Litig.,* No. 07 Civ. 9790(SHS), 2009 WL 2762708, at *23 (S.D.N.Y. Aug. 31, 2009).

FN42.*In re Citigroup ERISA Litig.,* 2009 WL 2762708, at *23 (quoting *In re Worldcom,* 263 F.Supp.2d at 767) (internal quotation marks omitted); *In re Avon Products, Inc. Sec. Litig.,* No. 05 Civ. 6803, 2009 WL 848083, at *13 (S.D.N.Y. Mar. 3, 2009) (concluding that "creating and filing required corporate documents with the SEC and making quarterly announcements of performance are corporate acts and do not by themselves trigger ERISA scrutiny."); *cf. Varity Corp v. Howe,* 516 U.S. 489, 504-05 (1996) (finding that company acted as ERISA fiduciary when it "*intentionally* connected its [deceptive] statements about Massey Combines's financial health to statements it made about the future of benefits, so that its intended communication about the security of benefits was rendered materially misleading.") (emphasis in original).

FN43.29 U.S.C. § 1024(b)(1).

In sum, the CAC sufficiently alleges that Ms. Uvino is a Plan fiduciary. It does not sufficiently allege that any of the Director Defendants are fiduciaries in any respect material to this case. The action therefore will be dismissed as to the Director Defendants. All that remains for consideration is the claims against Ms. Uvino.

*2. Prudence and loyalty claim (Count I)*

Count I alleges that the defendants failed to manage the Plan's assets prudently and loyally in that they continued to acquire and hold Lehman stock (the "prudence claim") and misstated and omitted material information about Lehman's financial condition (the "disclosure claim").

*a. The Disclosure Claim*

As a fiduciary, Ms. Uvino had a duty to disclose to beneficiaries negative information about the Plan if she knew or should have known that her failure to do so would cause harm. [FN44] While the CAC is replete with conclusory allegations that "[d]efendants knew or should have known" about various risks that could have harmed the Plan, [FN45] it is devoid of any factual allegations that Ms. Uvino knew or should have known any negative information that she was obliged to disclose or that she knowingly made any inaccurate statements. It alleges only that she was a "Senior Vice President and Global Head of Lehman's employee benefits functions" and that she "managed all aspects of the benefits programs and oversaw the Human Resources data management functions." There are no allegations that she was involved in valuing Lehman's assets, preparing its financial statements, or evaluating its financial position. The CAC's allegations are insufficient to state a disclosure claim against Ms. Uvino. [FN46]

FN44.*See Devlin v. Empire Blue Cross & Blue Shield,* 274 F.3d 76, 88 (2d Cir.2001) ("When a plan administrator affirmatively misrepresents the terms of a plan or fails to

provide information when it knows that its failure to do so might cause harm, the plan administrator has breached its fiduciary duty to individual plan participants and beneficiaries.") (quoting *In re Unisys Corp. Retiree Med. Benefit ERISA Litig.*, 57 F.3d 1255, 1264 (3d Cir.1995)).

FN45.*See, e.g.,* CAC ¶¶ 140-42, 146-47, 151, 155, 185.

FN46.*See Pugh v. Tribune Co.,* 521 F.3d 686, 700-701 (7th Cir.2008) ("A conclusory statement that all defendants should have known specific facts about a company is generally insufficient to state a claim; it must be alleged that each defendant was in a position to know or learn of the information."); *In re Citigroup,* 2009 WL 2762708, at *25 (holding allegations that defendants "knew or should have known" about Citigroup's "massive subprime exposure" insufficient to state a claim); *Crowley v. Corning, Inc.,* 234 F.Supp.2d 222, 230 (W.D.N.Y.2002) (granting motion to dismiss for failure of ERISA fiduciary to disclose inside information about company because the complaint made "no allegation that Committee members themselves 'had any actual knowledge of any misinformation' but made allegations against all defendants, without specifying when the 'adverse information' was available, or known" to any specific defendant).

b. *The Prudence Claim*

**\*5** ERISA requires plan fiduciaries to manage plan assets prudently. [FN47] In *Moench v. Robertson,* [FN48] the Third Circuit held that an employee stock ownership plan ("ESOP") fiduciary who invests in company stock is "entitled to a presumption that it acted consistently with ERISA by virtue of that decision." [FN49] While the Second Circuit has not specifically addressed the *Moench* decision, *Moench* is persuasive, and many courts in this district have adopted it, as have I. [FN50]

FN47.29 U.S.C. § 1104(a) (defining prudent man standard of care).

FN48.62 F.3d 553 (3d Cir.1995).

FN49.*Id.* at 571.

FN50.*See, e.g., In re Citigroup,* 2009 WL 2762708, at *16;*In re Avon Prods.,* 2009 WL 848083, at * 11;*In re Polaroid,* 362 F.Supp.2d at 474;*In re Worldcom,* 263 F.Supp.2d at 764.

Plaintiffs can overcome the presumption only by alleging that "the fiduciary abused its discretion." [FN51] This requires pleading the fiduciary's knowledge at a pertinent time of "an imminent corporate collapse or other 'dire situation' sufficient to compel an ESOP sell-off." [FN52]

FN51.*Moench,* 62 F.3d at 571.

FN52.*In re Avon Prods.,* 2009 WL 848083, at *11.

The Lehman Company Stock fund was an ESOP. [FN53] Ms. Uvino's fiduciary decisions respecting Lehman stock therefore presumptively were prudent. To state a sufficient and plausible claim, the CAC must overcome the presumption with factual allegations that Ms. Uvino actually or constructively knew about Lehman's imminent collapse, that she could have taken some action to protect the Plan, and that she failed to do so.

FN53. A plan is an ESOP when it "designate[s] itself in the plan document as an ESOP and ... 'specifically state[s] that it is designed to invest primarily in qualifying employer securities.' " The Lehman Stock Fund specifically designated itself an ESOP, and it was designed to invest primarily in Lehman stock. Plan § 8.3(a), Youngwood Decl. Ex. 2 ("The Company has provided for the establishment of the Lehman Stock Fund ... with the intent that such Fund ... constitute an employee stock ownership plan (ESOP) or fund.... [T]he Lehman Stock Fund shall at all times be invested exclusively in Lehman Stock [with very limited exceptions].").

Plaintiffs argue that even if the Lehman Stock Fund is an ESOP, it is not the type to

which the *Moench* presumption applies because the Plan did not require investment in the Lehman Stock Fund. This is a misreading of *Moench*, which itself dealt with an ESOP "in which the fiduciary [wa]s not absolutely required to invest in employer securities but [wa]s more than simply permitted to make such investments." *Moench*, 62 F.3d at 571. In these cases a rebuttable presumption applies. *See id.; In re Avon Prods.*, 2009 WL 848083, at *10 n. 22.

Lehman filed for bankruptcy shortly after 12:01 a.m on Monday, September 15, 2008. The fact that it did so means that a corporate collapse was "imminent" at some prior point in time. The CAC, however, fails to allege facts that permit a determination of when Lehman's financial condition reached that point. [FN54] Instead, the CAC alleges, in conclusory terms only, that there "were clear warning signs" of collapse and that defendants "knew or should have known" about Lehman's true financial state throughout the class period. [FN55]

> FN54. Although I do not rely on it in my decision, it bears mention that the *Wall Street Journal* reported on September 15, 2008 that it was Treasury Secretary Henry Paulson's Friday night revelation that the government would not bail out Lehman that "sparked" the events culminating in its bankruptcy. Deborah Solomon, et al., "Ultimatum By Paulson Sparked Frantic End," *Wall Street Journal*, Sept. 15, 2008, at A1.

> FN55.*See, e.g.,* CAC ¶¶ 142, 152, 161, 169, 192, 198, 203.

Even assuming that the CAC sufficiently alleged that Lehman's collapse became imminent at some time materially before the bankruptcy filing, it contains nothing to support the inference that Ms. Uvino, who worked in human resources, knew or should have known that. For most of the class period, Lehman posted profits, [FN56] and there are no factual allegations suggesting that Ms. Uvino knew or had inside information suggesting that any company financial reports were false or misleading. Lehman's $2.8 billion loss and the stock decline in the second quarter of 2008 are similarly insufficient to show that she knew Lehman was about to fold. [FN57] Finally, there is nothing in the complaint sufficient to raise any inference that Ms. Uvino knew or should have known of such things as J.P. Morgan's collateral demand.

> FN56.*See, e.g., id.* ¶¶ 143-50, 156, 162, 182-84, 204-06.

> FN57.*See, e.g., In re Citigroup*, 2009 WL 2762708, at *18 (quarterly loss of $18.1 billion and fifty-two percent stock drop during class period insufficient to overcome presumption of prudence).

In *Conley v. Gibson*, [FN58] the Supreme Court famously stated that a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts ... which would entitle him to relief." [FN59] If that were the controlling standard today, it perhaps would be arguable that the complaint permits an inference that the imminence of Lehman's failure was apparent to informed insiders before the weekend on which it actually occurred. But I need not decide that--let alone whether there would have been enough under *Conley* to warrant an inference that Ms. Uvino was aware of the imminence of the failure--because *Conley* no longer is the law. [FN60]

> FN58.355 U.S. 41 (1957).

> FN59.*Id.* at 45-46.

> FN60.*Twombly*, 550 U.S. at 563.

*6 In *Twombly v. Bell Atlantic Corp.*, [FN61] the Supreme Court expressly "retire[d]" *Conley's* "no set of facts" language and required judges to engage in a "context-specific" review of the complaint. [FN62] Pleading labels or conclusions is no longer sufficient. [FN63] Plaintiffs instead must plead enough facts to "nudge[ ] their claims across the line from conceivable to plausible." [FN64]

> FN61.550 U.S. 544 (2007).

> FN62.*Iqbal*, 129 S.Ct. at 1950.

> FN63.*Twombly*, 550 U.S. at 555.

> FN64.*Id.* at 570.

This pleading provides no "factual enhancement" to its claims that Ms. Uvino, an employee responsible for human resources data and employee benefits, knew or should have known about Lehman's dire financial condition prior to its bankruptcy filing. [FN65] From the CAC's factual allegations, it is only theoretically conceivable that she knew. *Twombly* prohibits me from crediting this type of speculation. [FN66] In consequence, the CAC fails to rebut the presumption of prudence. The prudence claim therefore fails to state a claim upon which relief may be granted.

> FN65.*See id.* at 557.
> Even assuming that Ms. Uvino knew about the bankruptcy preparations, there is nothing in the CAC from which reasonably to infer that she would have been able to divest the Lehman Stock Fund of Lehman common stock while the markets were closed on Saturday or Sunday. Moreover, any sale, at that time or in the preceding days, would have accelerated Lehman's collapse and reduced the Plan's value. *See In re Avon Prods.,* 2009 WL 848083, at *10 n. 24.

> FN66.*See Twombly,* 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level.")

### 2. The Duty of Loyalty Claim (Count II)

Count II alleges that defendants breached their duty of loyalty by failing to avoid conflicts of interest. The CAC is completely devoid of factual allegations that Ms. Uvino had any conflict of interest while discharging her Plan duties. The claim against her therefore must be dismissed. [FN67]

> FN67. The CAC alleges that the Director Defendants suffered from conflicts of interest in appointing the Plan Committee because they were Lehman's officers and directors and owned or sold Lehman stock. Neither serving as a corporate officer or director nor owning or selling stock is sufficient to state a conflict of interest claim in these circumstances. *See, e.g., In re Citigroup,* 2009 WL 2762708, at *26.

### 3. The Duty to Monitor Claim (Count III)

As the CAC fails to allege any primary breach of fiduciary duty, it cannot state a breach of the duty to monitor. [FN68]

> FN68.*See, e.g., Pugh v. Tribune Co.,* 521 F.3d 686, 702 (7th Cir. 2008); *In re Avon Prods.,* 2009 WL 848083, at *16.

### Conclusion

For the foregoing reasons, the defendants' motion [09 MD 2017, docket item 9; 09 Civ. 5598, docket item 65] is granted and the CAC is dismissed in its entirety.

SO ORDERED.

--- F.Supp.2d ----, 2010 WL 354937 (S.D.N.Y.)

END OF DOCUMENT